UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | |
|---|---|
| AMERICAN NATIONAL PROPERY AND CASUALTY COMPANY, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) No. 3:11-CV-219 ) |
| CAROL ANN STUTTE, *et al.*, | ) ) |
| Defendant. | ) |

### MEMORANDUM OPINION AND ORDER

Pending before the Court is the Defendants and Counter-Plaintiffs' (hereafter, collectively the "Stuttes") "Motion to Exclude the Opinion Testimony of Document Examiner Jane Eakes" [doc. 107]. The Stuttes filed a brief in support of their Motion [doc. 108] and the Plaintiff, American National Property and Casualty Co. ("ANPAC") responded [doc. 109]. The Stuttes filed a reply to ANPAC's response [doc. 114]. No oral argument is necessary and the Motion [doc. 107] is ripe for determination.

The key issue in this action is whether the ANPAC is obligated to cover the total loss of the Stuttes' home under a homeowners' insurance policy. Simply put, there is a dispute over whether the Stuttes set fire to their home intentionally. The respective theories of the parties are not relevant to this Motion except to note that ANPAC's proffered version of the events includes an allegation that one of the Stuttes spray-painted the word "QUEERS" on the home in effort to stage a fraudulent crime scene. To support this allegation, ANPAC disclosed a handwriting expert, Jane Eakes ("Eakes"), who

intends to give an opinion matching certain handwriting exemplars to the questioned graffiti. Both Eakes's expert report and portions of her deposition transcript have been submitted to the court in connection with this Motion.

Eakes testified as to the process she followed in her analysis. She first considered a number of exemplars received from ANPAC's counsel, which included photographs of spray-painted words on plywood, photographs of handwritten labels printed on storage cartons, copies of documents bearing Laura Stutte's signature, copies of insurance claim forms with handwritten notes, and a hotel "check-in" form with "Stutte, L" written at the top. She believed that the documents had been written by either Laura Stutte or Carol Stutte, but she did not know which. None of the exemplars were written for the purpose of the analysis; they were pre-existing documents. Eakes selected twelve of the exemplars to use as "evidence documents" in her analysis. The selected evidence documents included some of the spray-painted samples and the hotel check-in form. Eakes testified that she rejected certain samples that were provided to her because she could not conclusively identify them as having common traits with the other documents. (Eakes Depo. at 46:4-9, 14-25). ANPAC has submitted a template outlining the process that Eakes testified she used in her analysis.

Eakes identified multiple writing similarities among the evidence documents, particularly in the letters "E", "U", and "S". Comparing the characteristics in the evidence documents to the questioned writing, Eakes's report concluded that the QUEERS graffiti "was probably written by the same person(s) writing the known

documents of Laura and/or Carol Stutte." She later testified to the conclusion that the handwriting on the evidence documents matched that of the graffiti.

The authorship of the evidence documents is now in dispute. As exhibits to this Motion, each of the Stuttes submitted a separate affidavit claiming to have authored some of the documents. Notably, Carol Stutte asserts that her handwriting appears in the spray-painted exemplars (Eakes 0040-44). Laura claims authorship of several other documents, and both Stuttes deny that they authored the hotel check-in sheet; they attribute this writing to an unknown hotel clerk. The Stuttes seek to exclude Eakes's testimony under Rule 702 of the Federal Rules of Civil Procedure.

### *The Admissibility Standard for Expert Testimony*

Handwriting analysis is generally recognized as an area of expertise, and must therefore pass Rule 702's reliability test. *See U.S. v. Jones*, 107 F.3d 1147, 1159 (6th Cir. 1997). The rule provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Both scientific and non-scientific expert testimony, including that based on experience and skill, are subject to the same level of rigor under Rule 702. *Kumho Tire*

*Co. v. Carmichael*, 526 U.S. 137 (1999). The task of determining whether an expert's opinion meets the requirements of 702 is assigned to the court's discretion. The trial judge is the gatekeeper and must decide whether an expert's opinion is admissible under Rule 702. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993). "[W]here testimony's factual basis, data, principles, methods, or their application are called into question, the trial judge must determine whether the testimony has a reliable basis[.]" *Kumho*, 526 U.S. at 150. "The judge' role is to keep unreliable and irrelevant information from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value." *Wellman v. Norfolk and Western Ry. Co.*, 98 F.Supp. 2d 919, 924 (S.D. Ohio 2000). Thus, the district court has the responsibility to screen expert testimony. *Jahn v. Equine Services, PSC*, 233 F.3d 382, 388 (6th Cir. 2000) (citing *Daubert*, 509 U.S. at 589). "When a party proffers expert testimony, the district court must determine whether the testimony is both relevant and reliable when ruling on its admission." *Id.* (citing *Daubert*, 509 U.S. at 590-91). However, the court's gatekeeping role is not intended to supplant the jury's function as to the credibility of the expert or weight of the evidence. "[C]ross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the appropriate means of attacking shaky, but admissible evidence." *Daubert,* 509 U.S. at 596.

## *Analysis*

Turning to the present Motion, we must first consider whether Eakes is qualified to render an opinion on handwriting analysis and whether that opinion will assist the jury.

"The issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994), *cert. denied,* 513 U.S. 1111 (1995). ANPAC submitted a detailed CV listing Eakes's qualifications and experience, including some thirty years of work in the field and many court appearances as an expert handwriting analyst. Eakes's CV contains information demonstrating that she has the requisite "knowledge, skill, experience, training, or education" to offer the opinions which they have. Fed. R. Evid. 702. Moreover, the Stuttes do not challenge her qualifications to testify. The Court is thus satisfied that Eakes is sufficiently qualified to testify as a handwriting analyst. The Court is also convinced that Eakes's testimony will assist the jury. The authorship of the QUEERS graffiti is relevant to disputed issue of fact. Eakes's specialized knowledge and training allow her to make certain observations that a lay person cannot make. Her testimony can therefore assist the jury in deciding who authored the graffiti, which is relevant to the critical issue of whether the Stuttes burned down their house.

The Court next considers whether Eakes's analysis employed reliable methodology. The purpose of the reliability inquiry is to "assess whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. 579. Again, it is not the province of the Court to weigh the value of an expert's

conclusions. "The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Kumho*, 526 U.S. at 150.

ANPAC submitted a form worksheet outlining the procedures Eakes followed. She testified that the form reflects her training in handwriting analysis, and further testified to using books and treatises that were "recognized authoritative treatises in [the] field." She testified that her methods have been subject to peer review. Moreover, as with the first inquiry under 702, the Stuttes do not levy their attack at her process, nor do they argue that the conclusions of handwriting analysis are not sufficiently certain for court or that the principles of the field are unreliable. The Stuttes instead focus their attack on the application of Eakes's process to the facts of this case, particularly with regard to the foundations of her conclusions.

In part, the Stuttes claim that Eakes failed to use enough evidence documents and that she deliberately selected as evidence documents those exemplars that were most favorable to her desired conclusion. In support of the argument that too few documents were considered, the Stuttes cite Eakes's testimony that she would have a satisfactory basis for an opinion if she noted a similar trait in twelve out of twelve documents, but would not have a satisfactory basis if only six of those twelve showed the similarity. (Def. Brief at pp. 15). From the context of Eake's testimony, it appears that the Stuttes may have confused her point. Eakes was not referring to a requisite number of exemplars, but stating that where a number of exemplars match, she can form an opinion attributing them to a single person; however, where there are a number of similarities *and*

differences among a set of exemplars, it is more difficult to conclude that a single author wrote the lot. In other words, the inquiry rests on a ratio of consistency, not on a magic number. Eakes further testified that each case varies as to how many exemplars are necessary to form an opinion. Because the Stuttes have cited no study or other material to support their claims that handwriting analysis requires a set number of evidence documents, the Court is not persuaded that Eakes relied on an insufficient number of evidence documents in forming her opinion.

As to the argument that Eakes favorably selected her evidence documents, she testified that she chose not to use three of the known documents because she "could not prove" that they shared a common author with the other known documents. In other words, she considered them and determined that they were not helpful to her analysis. This is not the same as "ignoring data." Again, the Stuttes make no showing that an expert's analysis must fully incorporate every single piece of available evidence and Eakes testified that her process was sound. To the extent that the Stuttes want to show that Eakes failed to consider something potentially exculpatory, they are entitled to make their point through cross-examination.

The Court turns next to the Stuttes primary argument: that the facts upon which Eakes relied in reaching her ultimate conclusion were unreliable. The challenges here largely rely on the following assertions: (1) Eakes used writing samples from three individuals to form her master pattern; (2) Eakes failed to distinguish between the handwriting of Carol Stutte and Laura Stutte; (3) Eakes incorrectly identified Carol Stutte

as the author of the hotel check-in form; (4) Eakes matched the "QUEERS" graffiti to samples from three different authors, including the unknown author of the hotel check-in sheet; and (5) Eakes improperly assumed that the author of the questioned writing was attempting to disguise her script. The first four arguments are certainly relevant to Eakes's skill as a document examiner. However, they do not concern the admissibility of the evidence, but rather the weight it should be afforded. The purpose of the *Daubert* analysis is to examine an expert's <u>method</u>; the present Motion asks the Court to examine the expert's <u>accuracy</u>.

To explain, the root of the Stuttes' argument is that Eakes's testimony is unreliable because she used handwriting samples from three different individuals to create a "master pattern," which she then matched to the writing in question. Eakes did not know who authored the documents when she considered them, and determined that all or most of them were written by one individual. The Stuttes now claim that Eakes was mistaken because the documents were in fact written by three people. Therefore, according to the Stuttes, her analysis generated "false positives." (Def. Brief at pp. 20). To use a familiar analogy, the result would be similar to blending the fingerprints of three separate individuals to create a single "master print" belonging to a person who does not, in fact, exist. The Court agrees that, if this is what Eakes did, the mistake bodes negatively on her skill as an expert and may render her ultimate conclusion incorrect. However, there is a problem with the argument in that it is contingent on the truth of the Stuttes' affidavits attributing the evidence documents to different authors. ANPAC disputes the truth of the

affidavits and this Court cannot properly decide what is correct. Were it the case that all affidavits were taken as indisputable fact, there would be little need for trials. Other than the potentially self-serving affidavits submitted in support of this Motion, there is nothing to show that the evidence documents are not attributable to a single author. Whether or not the Stuttes are telling the truth about the documents' authors is an issue of credibility for the trier of fact; the mere fact that the Stuttes unilaterally declared that the exemplars were not proper does not make it so.

However, this logic gives rise to the conclusion that certain portions of Eakes's testimony are not proper based on the exemplars she used. The purpose of handwriting analysis is to identify consistencies between exemplars and questioned documents. Handwriting analysts use their training to identify similarities and differences among exemplars that an untrained eye is not likely to perceive. In this case, those exemplars are 1) the twelve evidence documents, and 2) the QUEERS graffiti on the Stuttes' home. Eakes is qualified to testify in this regard. To illustrate, she can compare the characteristics of the letter 'S' as written on any of the evidence documents to the characteristics of the letter 'S' as seen in the word QUEERS. She can give her expert opinion that the person who wrote the spray-painted evidence documents (EAKES 40-44) also wrote the contested document. Indeed, she testified to this opinion. (Eakes Depo. at 57:12-15, 88:18-20; 90:1-9). Eakes can likewise give her opinion that the person who wrote the spray-painted evidence documents also wrote the letter at EAKES 47 and the document at EAKES 48 and any other such opinion. What she is not qualified, however,

to do is to testify that the evidence documents and other exemplars are attributable to Carol and/or Laura because she did not have any documents that were known by her to be the authentic writing of either. In other words, it is not within the expertise of a handwriting analyst to name names where the samples are not authenticated as belonging to a known source. It just so happens that the common authorship of the documents is a disputed fact about which Eakes has no knowledge. As a qualified expert, she can give her opinion as to the similarities and differences between documents, but counsel bears the task of establishing the author of the evidence documents as a matter of fact.

To reiterate, if the Stuttes' affidavits are believed, they have identified some problematic determinations on Eakes's part and this is certainly fodder for vigorous cross-examination. Using the aforementioned illustrations, Eakes is <u>qualified</u> to testify that the spray-painted evidence documents share the same author as the EAKES 47 letter, which bears a "Laura Stutte" signature, and/or the graffiti in EAKES 42, but counsel is free to expose the purported inaccuracy of that opinion. If the jury is convinced that the evidence documents were written by three different authors, and that Eakes matched the writing of all three to the questioned document, it may very well find her testimony not credible. Likewise, if ANPAC's counsel proves common authorship of the exemplars by a preponderance of the evidence, the jury can connect the dots as it likes. However, this goes to the <u>weight</u> that her testimony is given, rather than its admissibility. Other challenges to Eakes's analysis, such as her failure to distinguish between the writing of Laura Stutte and Carol Stutte, attributing similarities in handwriting to genetics, and her

failure to cite percentages of the greater population exhibiting certain handwriting traits are further content for cross-examination, but do not render her methodology unreliable.

The Stuttes' argument that Eakes improperly assumed that the author of the graffiti was attempting to disguise their script is another matter. Eakes's conclusion that the QUEERS script was disguised and her opinion that the graffiti author's "normal habit" was to use a curved "E" because "they wrote it that way on everything else" have no basis. (Eakes Depo. at 76:15). It is an improper assumption that the graffiti author wrote the exemplars, improperly used to bolster an opinion. Furthermore, the assertion that someone disguised or intentionally altered their handwriting necessarily infers a motive. Eakes is not qualified to opine as to the author's mental state. Her expertise permits her to compare one sample to another: to observe that the curved "E" appears on some or all of the evidence documents and to observe that the graffiti author first wrote a curved "E" and then wrote a Greek "E" over it, if that is what the evidence shows. However, she cannot testify to any reasoning behind this particular action and certainly cannot characterize the writing as a product of a motive. In this regard, her testimony is an improper attempt to morph an opinion as to common authorship between the exemplars and the graffiti into a fact upon which she can then render a further impermissible opinion regarding an alleged motive. Eakes will not be permitted to render this opinion at trial.

Finally, the Court must determine if the probative value of Eakes's opinion is outweighed by its prejudicial effect. *Daubert*, 509 U.S. at 595; *United States v. Beverly*,

369 F.3d 516, 528 (6th Cir. 2004). As noted, Eakes's opinion is relevant to the disputed facts of this case and will assist the jury in determining the authorship of the QUEERS graffiti. The Stuttes argument that Eakes's testimony will unfairly prejudice them, confuse the issues, and mislead the jury is unpersuasive. Again, the Stuttes have improperly relied on disputed issues of fact to argue that Eakes's incorrect conclusions are confusing and misleading; the authorship of the exemplars is a question for the jury. The Stuttes also fail to note any way in which the testimony will unfairly prejudice them. It is significant that the Stuttes intend to present the testimony of their own document examiner at the trial of this case. Excluding ANPAC's expert while allowing the Stuttes' to present expert testimony on the same issue would work unfair prejudice to ANPAC. Rule 403 does not bar Eakes's opinion.

## Conclusion

Eakes is qualified to render an expert opinion regarding handwriting analysis. Her testimony is relevant and it may assist the jury, depending on (1) whether they accept Eakes's opinion that the person who wrote the exemplars also wrote the QUEERS graffiti, and (2) whom they find to be the authors of the exemplars. The Stuttes' challenges as to the accuracy of her opinions go to its weight, rather than its admissibility. The Court is confident that a jury in this district will be competent to weigh the testimony and the various challenges to its credibility with all of the other evidence presented at trial.

However, there must be limits to Eakes's testimony. First, any testimony identifying the author(s) of the evidence documents or the QUEERS graffiti as either Carol Stutte or Laura Stutte will be excluded; counsel may introduce other testimony or evidence to prove the authorship of the evidence documents. Second, Eakes will not be permitted to testify as to the motive of the graffiti's author or to make impermissible assumptions explaining the reason for its appearance.

Based on the foregoing, and consistent with this opinion, the Stuttes' "Motion to Exclude the Opinion Testimony of Document Examiner Jane Eakes" [doc. 107] is **DENIED** in part and **GRANTED** in part.

**IT IS SO ORDERED**.

ENTER:

    s/ Leon Jordan
UNITED STATES DISTRICT JUDGE