| | | |
|---|---|---|
| AMERICAN NATIONAL PROPERY | ) | |
| AND CASUALTY COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:11-CV-219 |
| | ) | |
| CAROL ANN STUTTE, *et al.*, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION & ORDER

This action is set for trial on July 28, 2015. Now before the court are four motions in limine filed by the Plaintiff ("ANPAC") [docs. 136, 138, 139, 140] and six motions in limine filed by the Defendants (collectively, the "Stuttes") [docs. 144, 145, 146, 147, 148, 149]. One motion in limine [doc. 137] has already been resolved [doc. 192].

I.

*Pertinent Background*

The case arises from the total destruction of the Stuttes home by fire on September 10, 2010. The facts underlying this insurance dispute have been summarized at length in a prior ruling of this Court [doc. 101] and will be referenced herein only to the extent necessary to address the instant motions. While there are many legal and factual issues for trial, the primary dispute will be whether the Stuttes intentionally destroyed their home. The Stuttes maintain that they were in Nashville at the time of the fire. After conducting an investigation, ANPAC denied their claim and filed this action seeking a declaratory judgment that they were not obligated to cover the loss under the terms of the Policy. ANPAC's complaint [doc. 1] alleges that the Stuttes

2

breached the contract by (1) causing their home to be destroyed, and (2) concealing and misrepresenting facts related to the claim. The Stuttes sought their own declaratory judgment and filed additional counter-complaints [doc. 53] in (1) breach of contract, (2) unfair and deceptive acts in violation of the Tennessee Consumer Protection Act; and (3) intentional and negligent infliction of emotional distress. The Stuttes also asked the Court to find that ANPAC acted in bad faith in refusing to pay their claim, asking for a statutory penalty under Tenn. Code Ann. 56-7-105. The claims for infliction of emotional distress were dismissed on summary judgment [doc. 102].

## II. *Analysis*

### A. ANPAC's First Motion in Limine

ANPAC moves to exclude any reference to or evidence that the Stuttes were not prosecuted for arson [doc. 136]. The Motion is supported by precedent in this Circuit. "Evidence of non-prosecution for arson is inadmissible, whether during a party's case-in chief, during cross-examination, or during rebuttal." *Kelly's Auto Parts, No. 1, Inc. v. Boughton*, 809 F.2d 1247, 1253 (6th Cir. 1987).

However, this case warrants some special consideration. The Stuttes response [doc. 164] cites case law finding the fact that an official investigation was conducted to be relevant. Indeed, the parties in this case appear to agree, because they have proposed evidence regarding the investigation in their pre-trial exhibit and witness lists. We must, therefore, take careful note to distinguish the occurrence of an official investigation from the occurrence of a criminal prosecution. Only the latter is the subject of this motion and only the same will be excluded by this order. Objections to any evidence regarding the arson investigation may be raised at trial.

**ANPAC's First Motion in Limine [doc. 136] will be GRANTED.**

### B. ANPAC's Second Motion in Limine

ANPAC moves Second Motion in Limine to exclude Mark Kinsman as a witness was **GRANTED** by this Court [doc. 192, following the parties' representations that the issue had been resolved.

### *C. ANPAC's Third Motion in Limine*

ANPAC third moves to exclude damages evidence of a job opportunity that the

4

Stuttes claim to have lost as a result of this litigation [doc. 138]. The Stuttes respond that they are not entitled to damages for the lost opportunity and but that the evidence is relevant to the bad faith determination [doc. 165]. The Stuttes seek to show that ANPAC continued to act in bad faith during the course of litigation, because it had knowledge of the job offer and disregarded the Stuttes' financial interests. In other words, the Stuttes contend that ANPAC acted in bad faith when it failed to dismiss its suit and pay the Stuttes' claim on learning that Laura Stutte had been forced to reject a job in Hawaii.

The Court finds the explanation disingenuous. The email by which the Stuttes' counsel informed ANPAC of the lost opportunity indicates that the opportunity had already been lost before ANPAC learned of it. Counsel stated "I am writing to inform you that Laura Stutte had been offered a high-paying nursing position[.]"[doc. 138-1]. ANPAC did not have the chance to reconsider its decision in light of Laura Stutte's job offer because she unilaterally turned it down before notifying ANPAC of it. Therefore, the loss of the job offer has no logical relevance to ANPAC's claims decision or the Stuttes' bad faith allegations.

**ANPAC's Third Motion in Limine is GRANTED. The Stuttes will not be permitted to introduce evidence relating to the loss of a job opportunity as relevant to either their damages or to ANPAC's actions.**

D. <u>ANPAC's Fourth Motion in Limine</u>

ANPAC seeks to exclude the deposition testimony of Dr. Larry Miller, an expert handwriting analyst who assisted the Tennessee Bomb and Arson investigation [doc. 139]. Dr. Miller's opinion concerns the authorship of the QUEERS graffiti found on the Stuttes' home

5

following the fire. The Court has already determined that this is a relevant question of fact.

Dr. Miller has not been disclosed as an expert in this case, and the deadline for expert disclosures has expired. However, the Stuttes deposed Dr. Miller and now seek to use his deposition as evidence at trial. ANPAC argues that Dr. Miller's deposition testimony contains impermissible opinions. While the deadline to object to expert opinions under a *Daubert* analysis has expired, ANPAC does not base its argument in *Daubert*, but rather on the procedural objection that Dr. Miller was not disclosed as an expert witness.

Rule 26(a)(2) requires disclosure of any expert witness whose opinion will be used at trial. Rule 26 (a)(2)(B) further requires parties to exchange "a complete statement of all opinions the witness will express and basis and reasons for them." A party that fails to comply with Rule 26's expert disclosure requirements "is not allowed to use that information or witness to supply evidence . . . at trial, unless the failure was substantially justified or is harmless." See also *King v. Ford Motor Co.*, 209 F.3d 886 (6th Cir. 2000) (upholding the exclusion of an undisclosed expert).

The parties do not dispute that Dr. Miller's deposition testimony is inadmissible. The Stuttes response asks to extend the exclusion to all evidence of Dr. Miller analysis, including an expert report [doc. 168]. The Court additionally notes that Dr. Miller does not appear on ANPAC's witness list [doc. 110].

**There being no apparent dispute, the Motion will be GRANTED. All evidence of and reference to any expert opinion of Dr. Miller, including his deposition testimony, shall be excluded at trial.**

### E. ANPAC's Fifth Motion in Limine

ANPAC moves to exclude the expert opinion reflected in the third report of the

6

Stuttes' handwriting expert, Charles Perotta [doc. 140]. The Stuttes filed a response [doc. 175], ANPAC replied [doc. 184], and the Stuttes filed a sur-reply [doc. 185]. In the original motion [doc. 140], ANPAC argues that the third report should be excluded because it was tendered after the deadline for expert disclosures. The parties do not dispute that Mr. Perotta's original report was timely disclosed. They argue that Mr. Perotta improperly changed his opinion and considered new physical evidence, depriving them of the chance to depose Mr. Perotta as to his opinions.

The Stuttes claim that Mr. Perotta's report was submitted to rebut the opinion and testimony of handwriting expert, Dr. Larry Miller. They characterize the opinion as "tailored to address the opinions of Dr. Miller."[1] [doc. 185 at p. 3]. Having determined in this opinion, **on the Stuttes' request and argument** [doc. 168], that the expert testimony of Dr. Larry Miller is inadmissible, the Court rejects the argument that the Stuttes were permitted to change their expert opinions following the deposition of an undisclosed expert as an unsupported legal conclusion. The Court further rejects the argument distinguishing the trigger for rebuttal opinions from the substance of the rebuttal opinions. The purpose of allowing a party to supplement an opinion after an opponent's expert disclosure is to rebut the opponent's evidence; it is not a blank check. The Stuttes cite no rule or legal principle that would allow them to introduce a rebuttal opinion where there is nothing to rebut, nor any permitting them to introduce untimely produced evidence merely because it is more compelling than what they disclosed in compliance with the rules.

As to the argument that the Stuttes believed they had until March 23, 2015 to supplement their expert reports, ANPAC apparently agrees. It concedes that the deadline to submit

---

[1] The Court declines to rule on whether the report does or does not reflect a tailored rebuttal opinion, because the parties have failed to provide Dr. Miller's report and do not describe the specific opinions that he rendered, nor how Mr. Perotta's third report rebuts them. To note, if the report were submitted solely for the purpose of rebutting Dr. Miller's opinion, it would fall under Rule 26(a)(2)(D)(ii). The Court does not consider whether it was timely under this provision.

7

additions or changes to an expert report was the day that the third report was filed, March 23, 2015. [doc. 184 at p. 2]. However, ANPAC argues that the third report is not a supplement, but a brand new opinion, which would therefore be untimely. The Stuttes claim that the changes are immaterial because the "substance" of Mr. Perotta's third report was contained in his second report. "The salient question, then, is whether [the] report truly qualifies as a 'supplemental report.'" *Innovation Ventures, L.L.C. v. N.V.E., Inc.*, No. 08-11867, 2014 WL 4979059, at *2 (E.D. Mich. Oct. 5, 2014).

Mr. Perotta sought to answer the question of whether the Stuttes were themselves responsible for the QUEERS graffiti on their home. His first report was produced on June 7, 2013 and was supplemented by a second report dated October 11, 2013. As "known" writing samples of Laura and Carol Stutte, Mr. Perotta used 3 items: (1) an errata sheet from Carol's deposition, (2) a letter from Laura, and (3) an errata sheet from Laura's deposition. His second report concluded:

> It could not be definitively determined if CAROL ANN STUTTE [AND/OR LAURA JEAN STUTTE], the writer[s] of [the known exemplars], did or did not prepare the questioned handprinting on the previously submitted specimen [QUEERS graffiti] as the questioned and known writing are not in the same wording and format, and therefore, fully suitable intercomparisons of questioned and known writing could not be made.
>
> However, in limited intercomparisons of questioned and known writing that could be made, writing characteristics were noted which indicate that it is more likely than not that CAROL ANN STUTTE [AND/OR LAURA JEAN STUTTE] did not prepare the questioned handprinting.

There is no challenge to this report or the opinion contained therein. Mr. Perotta's third report, the subject of the present Motion, reflects that he used ten additional known writing samples, all of which were spray-painted exemplars written by either Laura or Carol. He concluded:

> It was determine that CAROL ANN STUTTE [AND/OR LAURA JEAN STUTTE], the writer[s] of [the known exemplars used in the previous analysis <u>and</u> the additional spray-painted exemplars], did not prepare the questioned handprinting.

The Court does not buy that this was merely a "supplement" or even a "change" to

8

his prior opinions. First, the Court finds that the third report does reflect a new ultimate opinion. If the three possible conclusions are "yes", "no", and "I can't be sure" and one goes from "I can't be sure" to "no", as Mr. Perotta did, he has rendered a different opinion.

However, even if this were not a brand new opinion based on wholly different evidence, the most generous view shows that Mr. Perotta undertook a second analysis to complete his first one. Mr. Perotta's first report indicated an inability to accomplish "fully suitable intercomparisons" without better exemplars; he opined that the Stuttes probably did not write the graffiti, but he could not be certain because the exemplars and the graffiti were too dissimilar in form and content to be fully analyzed. He later remedied the uncertainty by running a new analysis with new, better exemplars some fourteen months later.[2]

Rule 26's duty to supplement is not a declaration of open season for experts to undertake new analyses or to evolve their opinions. The Southern District of Ohio recognized the danger in allowing opinions to be "transformed" by supplemental reports and refused to "create a system where preliminary reports could be followed by supplementary reports and there would be no finality to expert reports, as each side, in order to buttress its case or position, could "supplement" existing reports and modify opinions previously given." *Ullman v. Auto-Owners Mut. Ins. Co.,* No. 2:05-CV-1000, 2007 WL 1057397, at *5 (S.D. Ohio Apr. 5, 2007) (citations omitted). Another court noted:

> The Court cannot accept a definition of supplementation which would essentially allow for unlimited bolstering of expert opinions. Rule 26(e) envisions supplementation when a party's discovery disclosures happen to be defective in some way so that the disclosure was incorrect or incomplete and, therefore, misleading.... It does not cover failures of omission because the expert did an inadequate or incomplete preparation.... To construe supplementation to apply

---

[2] There is no indication as to why the Stuttes' counsel did not provide him with more suitable samples earlier, despite the Stuttes' evident willingness to provide them.

> whenever a party wants to bolster or submit additional expert opinions would reek [sic] havoc in docket control and amount to unlimited expert opinion preparation

*Saint-Gobain Corp. v. Gemtron Corp.,* No. 1:04 CV 387, 2006 WL 1307890, at *2 (W.D. Mich. May 9, 2006) (quoting *Akeva LLC v. Mizuno Corp.*, 212 F.R.D. 306, 310 (M.D.N.C.2002)).

The Court sees no difference here. Mr. Perotta failed to request, and the Stuttes failed to provide, the information that Mr. Perotta felt necessary to reach a conclusive opinion. To begin, it is clear to the Court that the samples Mr. Perotta considered were within the Stuttes' control since this case commenced, and, in any event, the Stuttes' could have provided him with spray-painted samples so he could reach a definite conclusion. They chose not to do so, and this Court sees no justification for their failure.

The Court is also unpersuaded by the argument that the new report does not prejudice ANPAC because it elected not to take Mr. Perotta's deposition. ANPAC's decision not to request a deposition was undoubtedly based on its analysis of his initial report. Parties are entitled to rely on opinions expressed in an expert's report without live examination and without the risk that the expert's opinions will become a moving target.

Mr. Perotta's report is not a supplemental report; it is a new report. Because it was not timely filed under Rule 26, it will be inadmissible at trial. ANPAC's Fifth Motion in Limine [doc. 140] will be **GRANTED.**

## F. *The Stuttes' First Motion in Limine*

The Stuttes move to exclude evidence relating to the Stuttes' relations with their neighbors [doc. 144]. The Stuttes identify several anecdotes that they anticipate ANPAC may introduce at trial, including testimony that the Stuttes did not like children and threw loud

parties. The Court first notes that specific instances of arguments among the neighbors are not directly relevant to the identity of the arsonist. However, ANPAC argues in response that the neighbors' animosity toward the Stuttes goes to their motive to destroy their home [doc. 166]. ANPAC is entitled to present their theory and to rely on circumstantial evidence as proof. Conflict between the neighbors may therefore be relevant. Likewise, to the extent that similar evidence would prove that one of the neighbors had a motive to destroy the home, the Stuttes will be entitled to its introduction. ANPAC also notes that it expects the Stuttes to make allegations that the community discriminated against them because of their sexual orientation and the evidence may be relevant to rebut those claims.

The Court is mindful of the potential for prejudice to the Stuttes' character that the evidence poses. The parties are advised that this trial will not become a neighborhood soap opera and that speculation and slander for the purposes of playing to a jury's emotions will not be permitted. The Court also agrees that the specific incidents the Stuttes describe in their motion do not appear relevant to the fire and carry significant risk of prejudice. However, ANPAC argues that the Stuttes are cherry-picking the evidence, selecting the most inflammatory pieces in effort to exclude all reference to the neighborhood conflicts, some of which could be more probative.

**Because the Stuttes' relationships with their neighbors may be relevant to show whether they had a motive to destroy their home, the motion to exclude all evidence of those relationships will be DENIED. To the extent that the Stuttes wish to challenge the relevance or potential prejudice of specific evidence at trial, the Court reserves its ruling. The issues will be addressed as they arise at trial.**

11

## G. *The Stuttes' Second Motion in Limine*

The Stuttes move to exclude evidence of Janice Millsaps's polygraph examination [doc. 145]. To state the relevant facts, there was some question during the investigation as to whether the Stuttes' neighbor, Ms. Millsaps, had a hand in destroying the Stuttes' home. Several weeks before the fire, in August 2010, the Stuttes filed a police report, alleging that Millsaps had threatened to burn down their house and had made derogatory remarks regarding the Stuttes' sexual orientation. The Stuttes suspected that Ms. Millsaps was somehow involved in the fire. As part of the official investigation, Ms. Millsaps volunteered to take a polygraph test. The scope of the polygraph test was limited to three relevant questions: (1) "Did you help anyone set that fire?", (2) "Did you set that fire?", and (3) "Do you know how that fire was set?" Ms. Millsaps was found to be truthful on all three. ANPAC relied on the results of her examination in their decision to deny the Stuttes' claim. The Stuttes now argue for a blanket rule that polygraph evidence is inadmissible. ANPAC does not argue that the evidence should be admitted during the liability phase of the trial, but takes the position that it should be admitted at the damages phase because it was a factor in their decision to deny the Stuttes' claim [doc. 167].

Generally, the use of polygraph results to prove a party's guilt or innocence is prohibited. *Barnier v. Szentmiklosi*, 810 F.2d 594, 596 (6th Cir. 1987). However, our circuit does not exclude polygraph evidence wholesale. The Sixth Circuit Court of Appeals outlined the standard for determining when polygraph evidence is admissible in *Wolfel v. Holbrook*, 823 F.2d 970, 972 (6th Cir. 1987). "First, the trial court must determine if the proffered evidence is relevant." *Id.* Second, "it must balance the probative value of the evidence against the hazard of unfair prejudice and/or confusion with could mislead the jury." *Id.*

Polygraph evidence has shown permissible in narrow circumstances where there

is no need to ensure that the test results are accurate. For example, in *U.S. v. Weiner*, the Sixth Circuit held that the results of a polygraph were admissible not to prove whether the examinee had been truthful, but to show why the FBI severed its relationship with a prior informant. 988 F.2d 629 (6th Cir. 1993). In *Murphy v. Cincinnati Ins. Co.*, a bad faith case similar to the current case, the Sixth Circuit separated the relevance of polygraph results from the examination's impact on the insurer. 772 F.2d 273 (1985). The court held that the insured's willingness to take a polygraph test was relevant to "the defendant's motive in refusing the claim." *Id.* at 277. In other words, the fact that the insured cooperated with the investigation was, or should have been, a factor that the insurer considered in making its decision to deny the claim and the fact that it did or did not do so was probative of its bad faith.

The Court finds that evidence of the polygraph test will be inadmissible as it relates to whether or not Ms. Millsaps had anything to do with burning the Stuttes's home. Because this is the only issue that will be decided during the first phase of trial, all reference to the polygraph will be excluded. However, the circumstances and results of the polygraph will be admissible for the limited purpose of showing that ANPAC denied the Stuttes's claim in good faith belief that they had burned their house. The Court finds that there is no need to ensure the accuracy of the test or the truth of Ms. Millsaps's answers in this regard, so long as ANPAC can show that it believed the test was accurate. Similar to the Court's decisions in *Weiner* and *Murphy*, this Court finds that the polygraph exam is relevant to ANPAC's motive in denying the claim. If ANPAC believed that an alternative suspect was exonerated on the basis of a polygraph exam, a reasonable jury could find that this belief was a factor in the ultimate denial. Furthermore, there is no risk of prejudice to the Stuttes because their liability will no longer be an issue in the damages phase of trial. Likewise, Ms. Millsaps's credibility will have already been decided and all matters to which her testimony may

13

conflict with the Stuttes' testimony will be settled. The Stuttes' only logical argument to exclude the polygraph exam is that ANPAC's reliance on a three-question polygraph was unreasonable. They are, of course, free to make this argument at trial, but it remains an issue of fact for the jury.

**The Stuttes' Second Motion in Limine [doc. 145] will be GRANTED insofar as the evidence related to Ms. Millsaps's polygraph examination will be excluded from the liability phase of the trial, and DENIED insofar as it will be permitted in the damages phase.**

### H. *The Stuttes' Third Motion in Limine*

The Stuttes move to exclude evidence of three unrelated insurance claims and law suits made by the Stuttes [doc. 146]. ANPAC filed a response in opposition [doc. 169].

The first claim was made under a policy with Farmers Insurance Group in 2004 and concerned the loss of a lawn mower in Oklahoma. The Stuttes' claim reported that the lawn mower was stolen and estimated its value at approximately $3700. The claim was subsequently withdrawn. The claims documents make mention of a dispute between the Stuttes and their neighbors in Oklahoma and suggest that the incident caused the Stuttes to fear for their safety.

The court has reviewed the insurance claim documents and finds that they are not relevant to the Stuttes' financial condition in 2010 or to any other alleged motive. However, ANPAC argues that the Stuttes did not disclose the prior claim when asked about it in their depositions. They equate the nondisclosure to a misrepresentation, which would void coverage. To be clear, ANPAC does not claim that the Stuttes made misrepresentations during the claims process with Farmers, but in this claims process. However, ANPAC fails to show how a $3700 loss that occurred six years prior and was possibly a theft constitutes a material fact as to this

14

claim, nor how the prior claim is otherwise relevant.

The Court further finds that evidence of the 2004 claim is inadmissible under Rule 403 because (1) the claim and the underlying dispute between the Stuttes and their neighbors may needlessly distract the jury and cause them to view the Stuttes in a negative light, and (2) it is too remote from the subject incident to be sufficiently probative of any fact in issue. **The 2004 claim with Farmers Insurance will be excluded from trial.**

The second claim concerns a car accident that occurred in 2009. Laura Stutte was named as a defendant in a civil action after being involved in a minor accident. The law suit was brought <u>after</u> the disputed fire in this case. The Stuttes also assert that they filed an insurance claim to cover the damages. The Court finds the accident, law suit, and insurance claim is not relevant to any issue or fact in dispute and does not tend to show that the Stuttes were in financial trouble. Addressing it before the jury would confuse the issues and unnecessarily consume judicial resources. **Evidence of the 2009 car accident and resultant law suit is therefore excluded under Rules 401-403.**

The third claim concerns a lawsuit filed by Ford Motor Company in August 2010 and seeking collection of a $7,478 on an unpaid loan, plus attorney's fees. Ford Motor voluntarily dismissed the claim in November 2010. The Court finds that the lawsuit is relevant to the Stuttes' financial condition at the time of the fire and will be admissible for this narrow purpose. Counsel for the Stuttes will be permitted to offer evidence as to why the claim was ultimately dismissed. **The 2010 lawsuit will be admissible at trial, but only for the limited purpose of proving that the Stuttes had a financial motive to destroy their home.**

**The Stuttes' Third Motion in Limine [doc. 146] will be GRANTED as to the 2004 Farmers Insurance claim and the 2009 car accident claim and DENIED as to the Ford**

15

**Motor Credit Matter, but only as it relates to the Stuttes' financial motive.**

### I. *The Stuttes' Fourth Motion in Limine*

The Stuttes move to exclude certain portions of handwriting analysis evidence related to the issue of who wrote the QUEERS graffiti on the Stuttes' house. [doc.147]. **This Motion will be GRANTED in part and DENIED in part.**

To reiterate, the graffiti is significant because it was first discovered at the time of the fire, giving rise to the obvious inference that the two incidents may be related. ANPAC alleges that the Stuttes themselves were responsible for the graffiti. The Court previously determined that the issue of who wrote the QUEERS graffiti on the Stuttes' home at or near the time of fire is relevant to facts in issue. The Court further determined that handwriting evidence, including the opinions of expert handwriting analysts, may be helpful to the jury in deciding the issue. The Stuttes' broad argument that handwriting evidence is irrelevant and confusing is therefore unpersuasive; the mere fact that ANPAC's theory of the case differs from the Stuttes' own does not render evidence supporting ANPAC's theory irrelevant.

The first challenge in the Stuttes' Fourth Motion in Limine [doc.147] relates to the portions of an investigation report of Gary Noland, the private investigator hired by ANPAC. Mr. Noland took photos of spray-painted signs at another property owned by the Stuttes and compared it with the "QUEERS" graffiti. ANPAC represents that it will not offer Mr. Noland as a handwriting expert. However, there is also the matter of his reports. In his report to ANPAC, Noland stated that he noticed similarities at first glance then examined the writings side by side. He pointed out specific similarities in detail and ultimately recommended that ANPAC hire an analyst to review the writing. Noland admitted in his report "I'm no handwriting expert[.]" He also testified in his deposition that he did not have significant experience in the field and did not

16

consider himself to be an expert. The Stuttes' objection is well-taken. The material contained in Mr. Noland's report has the distinct character of an expert opinion, which, by his own admission, he is unqualified to give. Fed. R. of Evid. R. 702. It is true that lay persons may be capable of comparing handwriting similarities in some instances, but this privilege is expressly reserved for witnesses familiar with a person's handwriting outside of the litigation. Fed. R. of Evid. R. 901(b)(2).

Mr. Noland's reports are excluded elsewhere in this opinion, following the Stuttes' Sixth Motion in Limine [doc. 149]. However, even if they were not, the portions dealing with handwriting comparison would be inadmissible for the reasons stated. **Likewise, any reference to Mr. Noland's suspicions, comparisons, and conclusions as to the common authorship of the QUEERS graffiti and any other document shall be excluded from the liability phase of the trial. As to whether the evidence and/or reports will be excluded from the damages phase of the trial, wherein bad faith will be an issue, the Court reserves judgment.**

The second challenge in the Stuttes' fourth motion in limine challenges the admissibility of the report of Larry Miller, an expert handwriting analyst who assisted the Tennessee Bomb and Arson investigation. **This portion of the motion is uncontested [doc. 170] and will therefore be GRANTED.**

Third, the Stuttes move to exclude certain photographs showing the Stuttes' handwriting. The photographs were taken from another property that the Stuttes own or occupy (referred to as the "Depot Street" property) and depict spray-painted signs and labeled cartons. Both Carol and Laura Stutte submitted affidavits attesting that the pictured handwriting belonged to them, and the photographs were used by experts in this case as exemplars for their analysis. The sole

17

ground for the Stuttes' motion is that the photos do not by themselves prove that who destroyed the house. The motion ignores the relevancy of the graffiti's authorship to the identity of the arsonist. As noted *supra*, the Court has already determined that the issue of who wrote the graffiti is relevant and that expert testimony in the area will be permitted at trial. Furthermore, it is recognized in this circuit that "[w]ith or without expert testimony, juries are allowed to make their own comparisons of handwriting in documents submitted in evidence." *United States v. Banks*, 29 Fed. Appx. 276 (6th Cir. 2002); *see also U.S. v. Saadey*, 393 F.3d 669 (6th Cir. 2005) (acknowledging the jury's ability to reach conclusions on handwriting under the rules of evidence).The Stuttes have cited no authority or persuasive reason that the jury should not be permitted to make their own conclusions as to who was responsible for the QUEERS graffiti. **This portion of the motion will be DENIED. The "Depot Street" photographs will be admissible at trial.**

## J. *The Stuttes' Fifth Motion in Limine*

The Stuttes move to exclude evidence related to ANPAC's witness, Joe Neubert [doc. 148]. As relevant here, the Stuttes have maintained throughout this litigation that they were on vacation in Nashville at the time of the fire. They anticipate that ANPAC will present a theory that the Stuttes enlisted Mr. Neubert to set the fire while they were away. Mr. Neubert is a friend of the Stuttes.

The Stuttes first ask to exclude evidence regarding Mr. Neubert's conflicts with the Stuttes' neighbors. They specifically reference an argument that occurred between Mr. Neubert and Gerald Daugherty over the use of a shared driveway. Mr. Daugherty testified that the argument had "come real close to blows." The motion [doc. 148] further references Janice

18

Millsaps's allegations that Mr. Neubert attempted to vandalize her property several months after the fire. ANPAC argues that the incidents are circumstantial evidence that Mr. Neubert was in the area before and after the fire [doc. 171]. However, the incidents did not occur on the same day as the fire and the Court fails to see how Mr. Neubert's being in the neighborhood months after the fire could make any fact in issue more or less probable. The Court further rejects ANPAC's argument that the incidents are relevant to show that the Stuttes created conflict with the neighbors and thus had a motive to destroy their home. While the Stuttes' arguments with the neighbors could conceivably be relevant to this theory, the Court does not believe Mr. Neubert's arguments are. Further, no incident occurring <u>after</u> the fire could possibly have any relevance to motive. **This portion of the motion [doc. 148] will be GRANTED.**

The Stuttes also ask the Court to exclude evidence of Mr. Neubert's criminal history contained in reports of ANPAC's private investigator, Mr. Noland. The report contains a summary of Mr. Neubert's criminal convictions, as discovered by a background check. It lists Mr. Neubert's past criminal cases as speeding, carrying a concealed weapon, two incidents of secret peeping, resisting a public officer, and manufacturing marijuana. The marijuana conviction occurred in 1998; the other charges date between 1989 and 1991. do not suggest arson or fraud. The Court sees no way that evidence of Mr. Neubert's remote crimes could be relevant to relevant to whether or not he was involved in a conspiracy to destroy the Stutte's home. Even the most recent incident occurred some 17 years ago, and none of the incidents suggest arson or fraud. ANPAC agrees that it will not seek to introduce evidence of Mr. Neubert's criminal convictions [doc. 171]. This portion of the motion will be **GRANTED** as uncontested. **All evidence of and references to Mr. Neubert's criminal convictions will be inadmissible at trial**.

19

However, ANPAC is entitled to present their theory of the case; if that includes argument that the Stuttes hired someone to destroy their home, then evidence as to the same would be relevant. The Stuttes argument to the contrary amounts to an attempt at blocking relevant evidence merely because it does not comport with their own version of events. Proof regarding argument that the Stuttes may have hired an arsonist will be permitted, assuming it complies with the rules of evidence. For this reason, the Stuttes' request to exclude all references to Mr. Neubert wholesale will be **DENIED**. To the extent that ANPAC seeks to introduce witness testimony that is speculative or otherwise impermissible, counsel will be permitted to raise appropriate objections at trial.

**The Stuttes' Fifth Motion in Limine [doc. 148] will be GRANTED in part and DENIED in part.**

## K. *The Stuttes' Sixth Motion in Limine*

The Stuttes move to exclude witness statements and recollections taken as part of Mr. Noland's private investigation[3] [doc. 149]. The recollections and statements are contained in several reports and letters that Mr. Noland created for ANPAC and in Mr. Noland's notes. The Stuttes reference item nos. 44 and 59 on ANPAC's Exhibit List [doc. 115]. Item 44 designates "Gary Noland's Reports" as exhibits for trial. Item 59 designates 14 unidentified documents. Although the Court does not have a full set of trial exhibits, some of the relevant documents are among the nine exhibits attached to this Motion [exhibits 3, 7, 8 to doc. 115]. The Stuttes argue

---

[3] It is noted that exhibit 2 to this Motion [doc. 115] consists of twenty-eight pages of handwritten notes taken by Mr. Noland in the course of his investigation (BATES 654-681). The document is labeled "Exhibit 2 – Noland". However, ANPAC did not designate exhibit two to Mr. Noland's as an exhibit at this trial. The Court does not consider its admissibility.

20

that the documents should be excluded because (1) they are hearsay, (2) Mr. Noland does not have personal knowledge of the matters discussed, and (3) they will be prejudicial.

The Court agrees with the Stuttes that the investigative materials are not proper for trial under Rules 403, 602, and 802 of the Federal Rules of Civil Procedure. The documents contain secondhand accounts of events and conversations, mental impressions, and many, many instances of pure speculation that are not proper for the jury's consideration. To give an example, Exhibit 3 to this Motion [doc. 149](exhibit 34 to Noland's deposition) is a report from Mr. Noland to ANPAC's counsel, dated July 18, 2011, after ANPAC had filed the present law suit. In part, it recounts incidents relative to the Stuttes' relationships with their neighbors, which the Court has already determined to have limited relevance to the case. It relates details of conversations that Mr. Noland had with various witnesses, including Detective Travis Jones of the Monroe County Sheriff's Office and several of the Stuttes' neighbors. Significantly, Mr. Noland quoted the detective as saying he believed the fire was an "insurance job," and that a criminal investigation was being considered. He also quoted Ms. Daugherty as speculating that the Stuttes hired a friend to destroy the home because she found it odd that the friend had not joined their trip to Nashville, and noted conversations between Ms. Daugherty and the Stuttes, as told to Mr. Noland by Ms. Daugherty. The reports filed as exhibits 7 and 8 to this Motion [doc. 149-7-8] have similar content, including eyewitness accounts of the night of the fire, accounts of conversations and relationships among the Stuttes' neighbors, as told to Mr. Neubert, and Mr. Neubert's personal impressions of the neighbors' credibility.

To the extent that the content is even relevant to the disputed issues, the statements are classic hearsay. The Sixth Circuit has previously recognized that statements given to an investigator are inadmissible unless they fall under an exception to the hearsay rule. *United States*

*v. Arnold*, 486 F.3d 177 (6th Cir. 2007); *Miller v. Field*, 35 F.3d 1088, 1091-92 (6th Cir. 1994) (discussing the admissibility of accounts made in a public investigative report). The Court sees no exception that would permit a secondhand account of an event and certainly not of a conversation. Likewise, Mr. Noland was not a witness to many of the events that he related. Rule 602 provides that "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that he has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the testimony of the witness himself." Fed. R. Evid. R. 602. There is no question that Mr. Noland did not personally witness the events described in his reports; his deposition testimony reflects that he wrote his reports solely "based on what [he] was told." (Noland Depo. at 114:14). The witnesses themselves may be qualified to testify as to their observations, but Mr. Noland's reports do not meet the standard of Rule 602.

Additionally and most importantly, the reports are replete with speculation and unsupported accusations against the Stuttes, made both by Mr. Neubert and the Stuttes' neighbors. For example, Ms. Millsaps reportedly told Mr. Neubert that the graffiti on the Stuttes' garage was there prior to September 10, 2010 and that the Stuttes had kept it covered, but admitted that she did not have a view of the garage from her house and had not seen the graffiti prior to the fire. The reports additionally contain salacious and unverifiable rumors regarding an alleged sexual affair, and a statement that Carol Stutte kept "an arsenal" of firearms in the home. These reports would doubtless color a jury's perception of the Stuttes and could mislead the jury to a enter verdict based on an improper view of the Stuttes' character, rather than the relevant facts. Additionally, the Court does not find significant relevant material in the reports that could not be admitted through live testimony or other evidence.

ANPAC has argued that the reports are relevant to rebut the Stuttes' bad faith

22

claims because they show that ANPAC undertook an investigation and relied upon it in denying the Stuttes claims and that they are not hearsay because they are not being offered for their truth. [doc. 172]. The reports would therefore be admissible during the damages phase of the bifurcated trial. Because the Court has not heard the Stuttes' position on this argument, it declines to rule at this stage and will allow the matter to be addressed at trial, should it reach the second phase.

**For the reasons stated above, The Stuttes' Sixth Motion in Limine [doc. 149] will be partially GRANTED. Mr. Noland's reports will be excluded from the liability phase of the trial. As to whether the evidence will be excluded from the damages phase of the trial, the Court reserves judgment.**

**IT IS SO ORDERED.**

ENTER:

_____s/ Leon Jordan_____
United States District Judge

23